Case 8:24-cv-00265-MSS-AAS   Document 1-1   Filed 01/29/24   Page 1 of 29 PageID 11

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.    CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>THIRTEENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>HILLSBOROUGH</u>   COUNTY, FLORIDA

<u>Benchmark International CSSA, LLC</u>
Plaintiff

Case # _____

Judge _____

vs.

<u>Gerard L. Burdi, Nicholas M. Burdi, Gerard Burdi, Trustee, Gerard Burdi Living Trust, Gerard Burdi, Trustee, Small Business Trust 2018, Nicholas Burdi, Trustee, Living Trust, Nicholas Burdi, Trustee, Small Business Trust 2018, Union Paving & Construction Co., Inc., Tracks Unlimited, LLC</u>
Defendant

### II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

### III.    TYPE OF CASE      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
        ☐ Business governance
        ☐ Business torts
        ☐ Environmental/Toxic tort
        ☐ Third party indemnification
        ☐ Construction defect
        ☐ Mass tort
        ☐ Negligent security
        ☐ Nursing home negligence
        ☐ Premises liability—commercial
        ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
        ☐ Commercial foreclosure
        ☐ Homestead residential foreclosure
        ☐ Non-homestead residential foreclosure
        ☐ Other real property actions

☐ Professional malpractice
        ☐ Malpractice—business
        ☐ Malpractice—medical
        ☐ Malpractice—other professional
☐ Other
        ☐ Antitrust/Trade regulation
        ☐ Business transactions
        ☐ Constitutional challenge—statute or ordinance
        ☐ Constitutional challenge—proposed amendment
        ☐ Corporate trusts
        ☐ Discrimination—employment or other
        ☐ Insurance claims
        ☐ Intellectual property
        ☐ Libel/Slander
        ☐ Shareholder derivative action
        ☐ Securities litigation
        ☐ Trade secrets
        ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

- 2 -

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

### COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**IV.     REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.     NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

  1

**VI.     IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.     HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.     IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☐ yes
    ☒ no

**IX.     DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Jason H Baruch        Fla. Bar # 10280
      Attorney or party             (Bar # if attorney)

Jason H Baruch           01/11/2024
  (type or print name)          Date

## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA
## CIVIL DIVISION

BENCHMARK INTERNATIONAL
CSSA, LLC,

        Plaintiff,

**v.**                                 Case No.

                                      Division:

GERARD BURDI,
NICHOLAS BURDI,
GERARD BURDI AS TRUSTEE
OF THE GERARD L. BURDI LIVING TRUST,
GERARD BURDI AS TRUSTEE OF THE
GERARD L. BURDI SMALL BUSINESS TRUST 2018,
NICHOLAS BURDI AS TRUSTEE OF THE
NICHOLAS M. BURDI LIVING TRUST,
NICHOLAS BURDI AS TRUSTEE OF THE
NICHOLAS M. BURDI SMALL BUSINESS TRUST 2018,
UNION PAVING & CONSTRUCTION CO., INC, and
TRACKS UNLIMITED, LLC

        Defendants.

_____/

## <u>COMPLAINT</u>

      Plaintiff Benchmark International CSSA, LLC ("**Benchmark**") sues Defendants, Gerard

Burdi ("**G Burdi**"), Nicholas Burdi ("**N Burdi**"),  Gerard L. Burdi Living Trust ("**GBLT**"), Gerard

L. Burdi Small Business Trust 2018 ("**GBSBT2018**"), Nicholas M. Burdi Living Trust ("**NBLT**"),

and Nicholas M. Burdi Small Business Trust 2018 ("**NBSBT2018**") (the six**,** together, the

"**Owners**")**,**  Union Paving & Construction Co., Inc, a corporation incorporated and existing under

the laws of New Jersey ("**Union Paving**"), Tracks Unlimited, LLC, a limited liability company

organized and existing under the laws of New Jersey ("**Tracks Unlimited**" and, together with

Union Paving, the "**Companies**" and, collectively with the Owners, the "**Defendants**") as follows:

## NATURE OF THE ACTION

1.      Certain of the Owners, then the owners of all of the outstanding equity of the Companies, entered into an exclusive contract with Benchmark, a business broker, for Benchmark to market and facilitate the sale of the Companies, their subsidiaries, and/or their assets (the "**Agreement**").

2.      After Benchmark learned through its research that the representation and warranty provided by Defendants in Section 10(a)(iii) of the Agreement was untrue,[1] the Agreement was amended to include GBLT, GBSBT2018, NBLT, and NBSBT2018 via an Amendment and Joinder signed by Benchmark and each of the Defendants on Feb 23, 2022 (the "**Amendment**"). A true and correct copy of the Agreement, as amended by the Amendment, is attached as "**Exhibit A**."

3.      It is undisputed that Defendants and Benchmark entered into an Agreement that vested the exclusive right to a transaction fee to Benchmark during the term of the Agreement and that such fee would be payable upon the consummation of "the alienation to any party, regardless of how or by whom procured … of title or beneficial interest (whether held directly or indirectly …) in any shares, [or] any membership or partnership interests" of the Companies. (Ex. A §5(d)).

4.      It is undisputed, due in part to Defendants' admission, that a change in ownership occurred on or before September 7th, 2023 (the "**Admitted Transaction**").[2] This admission was made directly by G Burdi both orally and then in an email to Benchmark, a true and complete copy of which is attached as "**Exhibit B**" (the "**Written Admission**"). The Transaction was described therein as a "buyout." Defendants, however, have failed to provide Benchmark with the

---

[1] Section 10(a) reads in relevant part: "Each Client Signatory hereby represents and warrants that: … (iii) the Client Signatories constitute the direct owners of all of the outstanding equity interest in the entity(ies) performing the Business …"

[2] Shortly after informing Benchmark of the Admitted Transaction, Defendants mysteriously backed out of talks with a third-party buyer brought to them by Benchmark. A formal written offer had been made and was being actively negotiated, through Benchmark, when Defendants suddenly declined to continue the talks without providing any definitive reason to Benchmark or the erstwhile buyer.

information required to either calculate its fee or determine whether or not it would seek a fee and they have failed to pay Benchmark any of the amount it is entitled to under the Agreement.  Based on the information provided to Benchmark by Defendants themselves, this payment of unknown amount is now past due.

## PARTIES

5.     Benchmark is a Florida limited liability company with its principal place of business in Tampa, Florida.

6.     Benchmark is a business broker that locates potential buyers for companies whose principals desire to sell their ownership interests and/or the assets owned or used by their businesses.

7.     Union Paving is a corporation incorporated and existing under the laws of New Jersey with its principal place of business in Mountainside, New Jersey.

8.     Tracks Unlimited, LLC is a corporation incorporated and existing under the laws of New Jersey with its principal place of business in Mountainside, New Jersey.

9.     G Burdi is an individual residing in New Jersey.

10.    N Burdi, is an individual residing in New Jersey.

11.    G Burdi is the Trustee of the Gerard L. Burdi Living Trust.

12.    G Burdi is the Trustee of the Gerard L. Burdi Small Business Trust 2018.

13.    N Burdi is the Trustee of the Nicholas M. Burdi Living Trust.

14.    N Burdi is the Trustee of the Nicholas M. Burdi Small Business Trust 2018.

## JURISDICTION AND VENUE

15.    The damages in this action exceed the Court's jurisdictional threshold of $30,000, exclusive of interest, attorneys' fees, and costs.[3]

16.    This Court has personal jurisdiction over Defendants.  The parties entered into a contract that required performance in Hillsborough County, Florida, which Defendants breached. *See* Fla. Stat. § 48.193(1)(a)(7).  In particular, Defendants failed to make payments due and owing in Florida to Benchmark.   The Agreement states: "Benchmark International represents and warrant[s] that all its bank accounts are presently maintained in the State of Florida and all payments to Benchmark International are processed in the State of Florida." (Ex. A, § 6(a).)  The Agreement further states that "[t]he Transaction Fee is due in addition to any other fees set forth in this Agreement and shall be paid in full directly to Benchmark International, <u>in Florida</u>." (*Id.* § 6(c) (emphasis added).)   Indeed, Defendants paid an initial one-time retainer fee under the Agreement pursuant to Benchmark's wiring instructions, which indicated Benchmark's address in Hillsborough County, Florida. Furthermore, Defendants called and emailed Benchmark in Hillsborough County, Florida, and Benchmark provided virtually all of its services for Defendants from Hillsborough County, Florida pursuant to the Agreement.

17.    Venue in this Court is proper because the causes of action in this case accrued in Hillsborough County, Florida.  *See* Fla. Stat. § 47.011.

## GENERAL ALLEGATIONS

A.    **Benchmark and Defendants' Agreement.**

18.    On December 22, 2021, the Defendants entered into the Agreement with Benchmark, which granted Benchmark the sole and exclusive right to market, broker, and sell the

---

[3] While the exact amount of the fee in question remains unknown to Benchmark, the minimum fee due under any circumstance is at least $2,000,000. *See* Ex. A §3(b).

Companies pursuant to an exclusive right to sell provision.  (Ex. A at preamble, § 1, and signature blocks)

19.    G Burdi executed the Agreement individually.  N Burdi executed the Agreement individually.  Accordingly, the Agreement defines the term "Client" and "Client Signatory" to include G Burdi and N Burdi individually. (Ex. A at 1, "The Client.")

20.    G Burdi also signed the agreement as President of, on behalf of, Union Paving as well as Managing Member on behalf of Tracks Unlimited, LLC Accordingly, the Agreement defines the term "Client" and "Client Signatory" to include the Companies as well.  (Ex. A at preamble and signature blocks). The Agreement was amended on Feb 23rd, 2022 to include Gerard L. Burdi Living Trust, Gerard L. Burdi Small Business Trust 2018, Nicholas M. Burdi Living Trust, and, Nicholas M. Burdi Small Business Trust 2018 as if they had been "Client Signatories" and part of the definition of "Client" as of the effective date of the Agreement. A true and complete copy of the "Amendment and Joinder" is attached hereto as the last two pages of **Exhibit A**.

21.    In the Agreement, the "Client Signatories", which assemblage includes all the Owners and both of the Companies, agreed, on a joint and several basis, to pay Benchmark two separate fees in exchange for Benchmark's services.  (Ex. A, §§ 3(b), 6(b).)

22.    The first of these fees is a one-time retainer of $75,000.  (Ex. A, § 3(a).)  It was timely paid upon execution of the Agreement.

23.    The second of these fees is a payment of the greater of a percentage of the "Transaction Value" or $2,000,000, in either case due "upon the closing of a Transaction" (the "**Transaction Fee**").  (Ex. A, § 3(b).)  The Transaction Fee has not been paid.

24.    The Agreement reiterates multiple times that the Transaction Fee is due at closing. For example, Section 6(c) states that "[t]he Transaction Fee is due in addition to any other fees set

forth in this Agreement and shall be paid in full directly to Benchmark International . . . ***contemporaneously with the closing of the Transaction***.” (Ex. A, § 6(c) (emphasis added).)  The Agreement further reiterates that prompt, timely payment to Benchmark is a material condition of the deal.  Indeed, Section 6(d) provides:

> “Time is of the essence with regard to all payments due under this Agreement. Client shall make all payments to which Benchmark International becomes entitled under this Agreement on the date Benchmark International becomes so entitled. For example, the Transaction Fee is due in full on the Transaction closing date.”

(Ex. A, § 6(d).)

25.    In Section 6(b) of the Agreement, Defendants agreed to accept joint and several liability for “the payment of the fees and other sums set forth in this Agreement.”  (Ex. A, § 6(b).)

26.    The Agreement defines the “Transaction Value” as:

> **“[T]he total benefit received or to be received by any Client and any of Client’s affiliates or related parties (each Client, affiliate, and related party, a <u>Client Party</u>) pursuant to the Transaction**[4] **regardless of the source, form, or timing of such consideration** and that such consideration may consist of one or more of the following illustrative examples if, in the sole discretion of Benchmark International, inclusion of such consideration would be warranted to calculate the total benefit received or to be received by any Client Party pursuant to the Transaction:
>
> (i)    any cash or other asset paid to, issued to, or transferred to any Client Party at the time of, or as a result of, the Transaction;
>
> (ii)   any liability of the Business which is assumed, paid, assigned, guaranteed or forgiven at the time of, or as a result of, the Transaction;
>
> (iii)  the maximum consideration which may be provided to any Client Party by any Counterparty[5] following the closing of the Transaction, regardless of whether any part of such consideration is deferred,

---

[4] “<u>Transaction</u> means the alienation to any party, regardless of how or by whom procured, by one or more of the Client Signatories or other owners of the Business of title to or beneficial interest (whether held directly or indirectly by such Client Signatory[ies]) in any shares, any membership or partnership interests, the goodwill, or substantially all of the assets of the Business or any division thereof including, without limitation: (i) a sale, transfer, merger, or disposal, in whole or in part, of the Business; (ii) the entering into, transfer or surrender of any lease, license, option, joint venture, partnership, or franchise; (iii) any other financial arrangement relating to the Business and having an effect similar to clause (i) or (ii) . . . .”  (Ex. A, § 5(d).)

[5] “<u>Counterparty</u> means, together with their affiliates and related parties, the person(s) and/or entitiy(ies) that enter(s) into a Transaction with any Client Signatory and shall include for all purposes at and after the closing of a Transaction those portions of the Business transferred pursuant to the Transaction.”  (Ex. A, § 6(c).)

6

contingent, or derived as a royalty, license, lease, franchise fee, salary, bonus, earn out, retention payment, incentive compensation, interest, sale of personal goodwill, issuance of securities pursuant to an option or warrant exercise, or the like; provided that if consideration is paid in the form of a salary to Gerard Burdi or Nicholas Burdi, only the amount above $500,000 each per year will be included in the calculation of the Transaction Value.[6]

(iv) any asset of the Business which is not purchased by any Counterparty(ies) and which is issued to, retained by or transferred to any Client Party prior to, on, or subsequent to the date of the Transaction; and

(v) the total consideration payable by the Counterparty(ies) to all Client Parties, including any consideration that is or would be payable under any option to acquire more of the Business than is acquired during the Transaction."

(Ex. A, § 7(a). Emphasis in the original.)

27. In order to allow Benchmark to calculate the Transaction Value, the Agreement requires Defendants to provide certain information to Benchmark. Specifically, Section 5(e)(iii) states:

"In the event Client elects not to fully involve Benchmark International in the matters leading up to the closing of such a Transaction, Client shall provide Benchmark International in writing and prior to such closing, at a minimum, (i) the full legal names of all Counterparties to such Transaction, (ii) the full legal names of any affiliates or related parties of such Counterparties which may have a bearing on any obligation to pay a Transaction Fee on such Transaction, (iii) the anticipated date of such closing (once known), and (iv) certified copies of all definitive agreements and other documents required in Benchmark International's reasonable discretion to allow Benchmark International to determine the Transaction Value and Transaction Fee and submit its invoice in time to ensure timely payment of the Transaction Fee."

(Ex. A, § 5(e)(iii).)

28. Further, the final sentence of Section 6(d) of the Agreement states:

"In the event Benchmark International has reason to believe that a Transaction Fee is due or that additional data is required to accurately calculate such fee, Benchmark International shall be entitled to a written accounting from **each** Client Signatory."

---

[6] This proviso concerning salary was inserted at the Client Signatories' insistence while originally negotiating the terms of the Agreement and appears in Section 1 of the Addendum to the Agreement.

7

(Ex. A, § 6(d) (emphasis added).)

29.     As further explained below, Defendants have not complied with any of the requirements in Section 5(e)(iii) or 6(d) throughout the process of changing the Companies' ownership structures.  In fact, Defendants continue to be in breach of Sections 5(e)(iii) and 6(d). Due to Defendants' ongoing failure to cure their breaches of Sections 5(e)(iii) and 6(d), Benchmark remains unable either to calculate the either the Transaction Value or the resulting (and now-past due) Transaction Fee or to determine whether or not to pursue a Transaction Fee and if so, how best to do so.

30.     After Benchmark expressed its view to the Defendants that the Admitted Transaction triggered the right to claim a fee under the express terms of the Agreement and requested additional details so as to determine whether or not to pursue such a fee, Defendants shifted to communicating with Benchmark exclusively through legal counsel, repeatedly denied that the Admitted Transaction constitutes a Transaction entitling Benchmark to a Transaction Fee, and signaled their unwillingness to work with Benchmark going forward by attempting to exercise their collective right to bring about the early termination of the five-year Agreement via transmission of a "Formal Termination Notice" from their counsel on December 6, 2023 (the "**Notice**"). Section 4(a) of the Agreement, which provides the only means to terminate the Agreement early reads:

> "This Agreement shall be effective until the earlier to occur of (i) the closing of a Transaction, (ii) the fifth anniversary of the Commencement Date, or (iii) the sixtieth calendar day following the date on which Client provides Benchmark International a Formal Termination Notice. (the Term)."

31.     The delivery of this Notice clearly indicated Defendants' view that the Agreement had not been terminated by a Transaction (pursuant to Section 4(a)(i) cited above) and their utter

8

unwillingness to work with Benchmark as a result of the change of ownership that had occurred.

32.   As of the date of this filing, neither Defendants nor their counsel have responded to any of Benchmark's communications sent after Benchmark's receipt of the Notice, a period exceeding 30 days.

**B.   Defendants' Admission of a Transaction.**

33.   After the parties entered into the Agreement, Benchmark worked for twenty-one (21) months to secure a buyer of the Companies pursuant to the Agreement.

34.   Pursuant to Section 2(f) of the Agreement, Benchmark assembled a portfolio of potential buyers for the Companies.  (Ex. A, § 2(f).)  Simultaneously, pursuant to Section 2(a) of the Agreement, Benchmark provided a detailed questionnaire, entitled a "company sale brief" to Defendants on or about January 5, 2022 for completion and pursuant to Section 2(b) of the Agreement, Benchmark prepared a one-page "teaser" for Defendants (the "**Teaser**"), which is a summary informational packet on the Companies that Benchmark would deliver to prospective buyers of the Companies to garner interest for its potential purchase.  (*Id.* §§ 2(a) and (b).)  Benchmark also prepared a 45-page confidential information memorandum for Defendants (the "**Information Memorandum**"), which details confidential information about the Companies that Benchmark would deliver to prospective buyers that have expressed interest in obtaining information on the company beyond the Teaser.  (*See id.* § 2(d).)  On June 27, 2022, Defendants approved both the Teaser and the Information Memorandum.[7]  Benchmark then distributed the approved Teaser to prospective buyers.  Benchmark required prospective buyers to enter into a confidentiality and non-disclosure agreement ("**NDA**"), which would be approved by Defendants in writing for each case, before those prospective buyers could obtain the Information

---

[7] The Teaser and Information Memorandum were significantly revised by Benchmark in 2023 due to changes at the Companies and both updated documents were approved by Defendants on June 7, 2023.

Memorandum. (*See id.* § 2(c).) A total of 46 Information Memorandums were approved by Defendants and disseminated by Benchmark.

35.    Benchmark also posted the Teaser on several market portals and platforms, as contemplated by Section 2(e) of the Agreement. (*See* Ex. A, § 2(e).) As a result of Benchmark's outreach efforts, most likely the posting of the Teaser on one of the aforementioned market portals, the President of a corporation interested in acquiring construction businesses (the **"Strategic Acquirer"**), contacted Benchmark to inquire about the business described in the Teaser (i.e., the Companies).

36.    On June 12, 2023, Defendants approved the Strategic Acquirer's NDA and profile in writing. As a result, Benchmark then provided the Information Memorandum to the Strategic Acquirer.

37.    Thereafter, in accordance with Section 2(g) of the Agreement, Benchmark managed the interactions and flow of information between Defendants and the Strategic Acquirer. In particular, between June 12th, 2023 and July 31st, 2023, Benchmark provided substantial assistance with negotiations between Defendants and the Strategic Acquirer for the potential sale of the Companies, leading to the submission of a non-binding indication of intent (the "**IOI**") submitted by the Strategic Acquirer.[8]

38.    The IOI was dated July 31st, 2023, and was submitted to Benchmark on or about August 2nd, 2023. Among other things, the IOI stated that the Strategic Acquirer valued the Companies at $150 million. In addition to the $150 million, the IOI offered to allow the Defendants to retain the cash on the Companies' balance sheets and called for the execution of an

---

[8] The Strategic Acquirer's offer was the third such offer brought to Defendants by Benchmark during the engagement. Each of such offers was sufficiently close enough to Defendant's expectations to spark the interest of Defendants and Defendants and Benchmark engaged in significant negotiations with all three buyers.

employment agreement with at least one of the Owners following the closing.[9]

39.     Following the presentation of the IOI, Benchmark continued to work with Defendants to find a suitable compromise on the terms of the IOI until September 19th, 2023 when the Defendants abruptly determined the offer was not acceptable and formally passed on the Strategic Acquirer as a potential acquirer for no definitive reason.

40.     During the course of redlining the IOI to provide a counter, it was brought to Benchmark's attention on a phone call with G Burdi that neither N Burdi nor any entity associated with him (i.e., NBLT and NBSBT201) were then an owner of either of the Companies, and that N Burdi's shares and membership interests (and those of his entities NBLT and NBSBT201) amounting to 50% of the total outstanding equity in each Company had been transferred to Kyle Burdi ("**K Burdi**") and one or more associated entities owned or controlled by K Burdi (the "**Oral Admission**").

41.     This change in ownership was further referenced in an ownership structure sent to Benchmark by G Burdi on September 7th, 2023 in the Written Admission.

42.     K Burdi was not identified to Benchmark as an owner of either of the Companies when the Agreement was executed (or even when it was amended).

## COUNT I
### Breach of Contract

43.     Benchmark incorporates the allegations in paragraphs 1 through 42 of the Complaint by reference as if fully set forth herein.

44.     The Agreement is valid and enforceable.

45.     Benchmark performed its obligations under the Agreement for the benefit of

---

[9] As such, had this offer led to a consummated Transaction, Benchmark's fee would have exceeded $5.25 million.

11

Defendants.

46. Defendants materially breached the Agreement by, among other things:

    a. declining to provide Benchmark with copies of all draft and final agreements exchanged related to the Transaction; and

    b. declining to provide Benchmark with a full accounting and all additional data required for Benchmark to calculate the full value of the Transaction Fee.

47. Defendants' breach of the Agreement has caused damage and continues to cause damage to Benchmark.

WHEREFORE, Benchmark demands:

A. injunctive relief or specific performance against Defendants to compel their immediate compliance with their disclosure and other obligation required under Section 5(e)(iii) of the Agreement;

B. injunctive relief or specific performance against Defendants to compel their immediate compliance with the accounting obligations of Section 6(d) required under the Agreement;

C. a declaratory judgment pursuant to Fla. Stat. § 86.061 that the Admitted Transaction constitutes a Transaction as defined in Section 5(d) of the Agreement;

D. a declaratory judgment pursuant to Fla. Stat. § 86.061 that, as a result of the closing of the Admitted Transaction, a Transaction Fee came due to Benchmark on the date of such closing and is now past due; and

E. a judgment against Defendants for damages, costs, attorneys' fees, contractual pre-judgment and post-judgment interest; and any further relief that is appropriate and just.

Dated:  January 11, 2024

Respectfully submitted,

*/s/Jason Baruch*
Jason H. Baruch
Florida Bar No. 10280
Anne L. Kelley
Florida Bar No. 1026226
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, FL 33602-3644
Telephone:  813-227-8500
Facsimile:  813-229-0134
E-Mail: jason.baruch@hklaw.com
E-Mail: anne.kelley@hklaw.com
Secondary E-Mail:
wendysue.henry@hklaw.com
andrea.olson@hklaw.com

13

Case 8:24-cv-00265-MSS-AAS   Document 1-1   Filed 01/29/24   Page 17 of 29 PageID 27

**IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA
CIVIL DIVISION**

BENCHMARK INTERNATIONAL
CSSA, LLC,

     Plaintiff,

v.                                     Case No.

                                        Division:

GERARD BURDI,
NICHOLAS BURDI,
GERARD BURDI AS TRUSTEE
OF THE GERARD L. BURDI LIVING TRUST,
GERARD BURDI AS TRUSTEE OF THE
GERARD L. BURDI SMALL BUSINESS TRUST 2018,
NICHOLAS BURDI AS TRUSTEE OF THE
NICHOLAS M. BURDI LIVING TRUST,
NICHOLAS BURDI AS TRUSTEE OF THE
NICHOLAS M. BURDI SMALL BUSINESS TRUST 2018,
UNION PAVING & CONSTRUCTION CO., INC, and
TRACKS UNLIMITED, LLC

     Defendants.
_____/

**EXHIBIT A TO**

**<u>COMPLAINT</u>**

**TERMS OF ENGAGEMENT**

**This Agreement does not obligate Client to enter into a Transaction with any person or entity and does not convey any authority on Benchmark International to bind or otherwise obligate Client to any legal obligations. Client has the choice to reject any offer presented pursuant to this Agreement for any reason or no reason whatsoever.**

This Terms of Engagement (the **Agreement**) is made as of December 22, 2021 (the **Commencement Date**) by and among Union Paving & Construction Co., Inc., a corporation incorporated and existing under the laws of New Jersey; Tracks Unlimited, LLC, a limited liability company organized and existing under the laws of New Jersey; Gerard Burdi; Nicholas Burdi (each a **Client Signatory** and, the four, collectively, the **Client**) and

Benchmark International CSSA, LLC, a limited liability company organized and existing under the laws of Florida (Benchmark International)

R E C I T A L S

WHEREAS, Client desires to engage Benchmark International to market and facilitate the sale of all or any ownership interests in Union Paving & Construction Co., Inc.; Tracks Unlimited, LLC its (their) subsidiaries, if any, and all or part of the assets (whether real or personal, tangible or intangible) owned by such entity(ies) or used by such entity(ies) in heavy construction (the **Business**).

A G R E E M E N T

NOW, THEREFORE, in consideration of the covenants and agreements contained herein and other good and valuable consideration, the Client Signatories and Benchmark International agree as follows:

1.   **The Engagement**
In exchange for the Services, Client hereby grants Benchmark International the sole and exclusive right to market, broker, and sell the Business during the Term. As a result, Client is hereby:
  (a)   representing to Benchmark International that no Client Signatory is presently engaged on its own or with any other party for purposes of offering the Business for sale or for any other purpose that would interfere or compete with Benchmark International's Services;
  (b)   covenanting that no Client Signatory will engage with any other party or on its own for purposes of offering the Business for sale or for any other purpose that would interfere or compete with Benchmark International's Services during the Term;
  (c)   covenanting to cooperate fully and promptly with Benchmark International during the Term in furtherance of the purposes of this Agreement and to immediately refer all inquiries on the Business to Benchmark International; and
  (d)   acknowledging that in the event any Client Signatory has engaged a party in the past to offer the Business for sale, or for any other reason that would result in the payment of a contingent fee to such party should a Transaction close after the Commencement Date, such engagement has been terminated and any payments that may become due thereunder shall have no effect on the fees due to Benchmark International hereunder ((a) through (c), collectively, the **Engagement Terms**).

2.   **The Services**
In exchange for the Engagement Terms and fees set forth herein, Benchmark International will act as the facilitator to identify prospective acquirers; market the Business; conduct or lead, as Client instructs, negotiations with all interested prospects; and, if applicable, produce letters of intent for presentation to Client and Client's legal and tax advisory teams. Benchmark International's proven service delivery model includes the following components (collectively, the **Services**).
  (a)   A company sale brief which, when completed by Client, will be used by Benchmark International's assigned Deal Team to prepare marketing materials and begin developing a customized go-to-market strategy.
  (b)   A one-page teaser to be provided to prospective Counterparties. The teaser (i) is intended to protect the identity of the Business, (ii) will be approved by Client before being circulated to any prospects, and (iii) is designed to elicit from prospects an initial expression of interest and willingness to sign a non-disclosure agreement.
  (c)   Benchmark International's standard non-disclosure agreement to be used as a basis for non-disclosure agreements to be executed by Benchmark International and each prospect interested in receiving information about the Business beyond that provided in the teaser.
  (d)   A detailed confidential information memorandum which will (i) be approved by Client before being circulated to any prospects, (ii) identify the Business by name and (iii) contain confidential information about the Business. This document is designed to encourage prospects to request additional information and an introduction to Client and will only be shared with prospects who have (x) executed a non-disclosure agreement and (y) been approved by Client.
  (e)   Posting teasers or summaries of teasers on third party and Benchmark International market portals and platforms which are best suited, in Benchmark International's discretion, for the Business.
  (f)   A proprietary customized portfolio of potential Counterparties identified specifically for the Business, generated and updated from time to time from Benchmark International's existing data base and relationships, third-party commercial M&A databases to which Benchmark International subscribes, input from Client, and any or all of the following sources which may be applicable in Benchmark International's discretion: recent press releases, responses to nonspecific inbound marketing efforts and other advertisements, trade association lists, generic search engine queries, and face-to-face meetings at industry events, trade shows, and/or private equity conferences (the **Proprietary Prospect Portfolio**).
  (g)   Ongoing negotiation with and pro-active management of all prospects from lead development through execution of a letter of intent. A letter of intent is (typically) a non-binding expression of interest designed to be executed by both seller and the potential Counterparty  that lays out the principal agreed-upon points of a Transaction. Letters of intent are also at times referred to as "LOIs" or "term sheets."
  (h)   Following the execution of a letter of intent, as requested by Client and permitted by Client's attorney, the Counterparty, and applicable law:
    (i)    administration of the online data room required for the Counterparty's due diligence investigations;
    (ii)   management of the process for responding to the due diligence inquiries of the Counterparty, its lenders, and its specialized diligence providers;
    (iii)  negotiation of additional financial deal points not covered in the letter of intent such as net working capital targets and formulas;
    (iv)   collaboration with Client and the other professionals on Client's broader deal team such as legal counsel, tax advisors, accountants, and wealth managers; and/or
    (v)    performance of various ministerial duties such as arranging and administering recurring deal status calls with all parties and preparation of the working group list and funds flow memo.
  (i)   From engagement to closing of a Transaction, continuous live and email access to the dedicated Benchmark International Deal Team to allow complete, up-to-the-minute visibility into the progress and roadmap, to answer questions, and to ensure that the process is meeting Client's expectations.

3.   **The Fee**
In exchange for the Services, Client will pay to Benchmark International:
(a) upon execution of this Agreement, a one-time retainer of $75,000 and
(b) in addition to the foregoing, upon closing of a Transaction, a success fee (the **Transaction Fee**) equal to the greater of (i) 3.50% of the Transaction Value or (ii) $2,000,000.

4.   **The Term**
  (a)   This Agreement shall be effective until the earlier to occur of (i) the closing of a Transaction, (ii) the fifth anniversary of the Commencement Date, or (iii) the sixtieth calendar day following the date on which Client provides Benchmark International a Formal Termination Notice.(the **Term**).
  (b)   If at any time between the delivery of any Formal Termination Notice and the anticipated resulting effective termination (i) Client is in breach of this Agreement, (ii) any fees due to Benchmark International remain outstanding, or (iii) negotiations concerning a Transaction are occurring, such Formal Termination Notice shall be invalid and have no effect.

19.2(0) See Addendum A

**5.   Service Standards and Process; Client's Responsibilities**

(a)   Benchmark International shall provide the Services with reasonable skill and care in accordance with its customary practices, preserve and protect the confidential information of the Business as set forth herein, and inform Client of any known or suspected potential or actual conflict of interest involving the Services.

(b)   Prior to disclosing any identifying or sensitive information about the Business or Client other than any such information that was contained in a Client-approved teaser or similar document, Benchmark International shall obtain a signed non-disclosure agreement from the intended recipient of the information and Client's approval of such agreement. Thereafter, Benchmark International may, in its discretion, pass any information provided under this Agreement that Benchmark International reasonably believes is necessary or proper for the provision of the Services. Client authorizes Benchmark International to communicate with any prospect and to have discussions with that party pursuant to, and subject to the limitations of, this Agreement. Client may limit the authority granted in this Section 5(b) by written notice to Benchmark International (provided that such notice shall not limit Benchmark International's ability to use any still-accurate information contained in a client-approved teaser as part of a general solicitation or posting). Client shall be solely responsible for providing notice of any such limitation where required by law or any pre-existing contractual obligation(s) of Client.

(c)   Benchmark International is authorized to communicate with any accountant, attorney, or other advisor retained by Client for the purpose of obtaining any information beneficial to its provision of the Services.

(d)   Benchmark International's failure to identify any prospects for the Business shall not constitute a breach of this Agreement and Client acknowledges that Benchmark International cannot guarantee the successful consummation of any Transaction. **Transaction** means the alienation to any party, regardless of how or by whom procured, by one or more of the Client Signatories or other owners of the Business of title to or beneficial interest (whether held directly or indirectly by such Client Signatory[ies]) in any shares, any membership or partnership interests, the goodwill, or substantially all of the assets of the Business or any division thereof including, without limitation: (i) a sale, transfer, merger, or disposal, in whole or in part, of the Business; (ii) the entering into, transfer or surrender of any lease, license, option, joint venture, partnership, or franchise; (iii) any other financial arrangement relating to the Business and having an effect similar to clause (i) or (ii); (iv) the filing of a petition for bankruptcy or receivership on, on behalf of, or against any Client Signatory; or (v) the filing of a request to register any securities of a Client Signatory with the Securities and Exchange Commission (or similar regulatory body outside the United States).

(e)   Due to the sole and exclusive nature of this engagement:

(i)   Client shall (i) promptly notify Benchmark International in reasonable detail of all expressions of interest concerning a Transaction which Client receives during the Term through any source other than Benchmark International and (ii) inform any such potential Counterparty(ies) of Benchmark International's sole and exclusive engagement prior to engaging in any discussion (other than an outright rejection of an unsolicited inquiry) concerning a potential Transaction.

(ii)   In the event any negotiations concerning a potential Transaction for which Benchmark International would or might reasonably be anticipated to be entitled to a Transaction Fee, Client shall ensure that Benchmark International is promptly informed of all negotiations with such potential Counterparty(ies) and, prior to the execution of any letter of intent or acceptance of any offer, notify both Benchmark International and Client's anticipated Counterparty(ies), in writing, of Benchmark International's entitlement or potential entitlement to receive a Transaction Fee as a result of the contemplated Transaction.

(iii)   In the event Client elects not to fully involve Benchmark International in the matters leading up to the closing of such a Transaction, Client shall provide Benchmark International in writing and prior to such closing, at a minimum, (i) the full legal names of all Counterparties to such Transaction, (ii) the full legal names of any affiliates or related parties of such Counterparties which may have a bearing on any obligation to pay a Transaction Fee on such Transaction, (iii) the anticipated date of such closing (once known), and (iv) certified copies of all definitive agreements and other documents required in Benchmark International's reasonable discretion to allow Benchmark International to determine the Transaction Value and Transaction Fee and submit its invoice in time to ensure timely payment of the Transaction Fee.

(f)   Each Client Signatory jointly and severally represents and warrants to Benchmark International that (i) all information provided pursuant to this Agreement is, to the best of such Client Signatory's knowledge, full, complete, accurate, and is not in any way false or misleading, (ii) he, she, or it shall promptly, and in any event prior to its approval of such document, inform Benchmark International of any error or material omission in or related to any statement in a teaser, confidential information memorandum, or other document provided by Benchmark International for Client's review, and (iii) he, she, or it shall promptly inform Benchmark International of any material changes to the information provided under this Agreement or otherwise contained in any document approved by Client. Each Client Signatory shall jointly and severally indemnify, defend, and hold Benchmark International, its affiliates, and its and their employees harmless against any claim of Client or a third party arising as a result of, or relating to or arising out of, Client's breach or alleged breach of this Section 5(f) or any of the Engagement Terms provided in Section 1 above.

(g)   BENCHMARK INTERNATIONAL DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES WHICH ARE NOT EXPRESSLY STATED IN THIS AGREEMENT, WHETHER EXPRESS OR IMPLIED, TO THE FULLEST EXTENT PERMISSIBLE BY LAW. BENCHMARK INTERNATIONAL DISCLAIMS ANY AND ALL WARRANTIES AND WARRANTIES TO ANY PARTY THAT IS NOT A CLIENT SIGNATORY AND CLIENT ACKNOWLEDGES THAT THERE ARE NO INTENDED THIRD-PARTY BENEFICIARIES OF THIS AGREEMENT.

(h)   Benchmark International shall not be responsible for giving or obtaining any professional or otherwise specialized advice or services regarding any matter including, without limitation, legal, accounting, tax, due diligence, debt brokerage, or investment advice. Nor shall Benchmark International be responsible for giving or obtaining any advice regarding matters for which Client has engaged an advisor. Client is encouraged to seek and agrees to seek the appropriate, duly-licensed professionals for legal, accounting, tax, due diligence, debt brokerage, and investment guidance prior to executing any binding agreement concerning a Transaction. For purposes of clarity, the foregoing precludes Benchmark International from drafting or editing any definitive agreements or disclosure schedules to the purchase agreement. Upon Client's request, Benchmark International will provide contact information for advisors with whom past clients have been highly satisfied in terms of performance and charges.

(i)   Benchmark International covenants not to (i) solicit for employment any employee of the Business or (ii) intentionally induce any such employee to terminate his or her employment with the Business. Client covenants not to (i) solicit for employment any Benchmark International employee who is known to any Client Signatory to have provided Services pursuant to this Agreement or (ii) intentionally induce any such employee to terminate his or her employment with Benchmark International.

(j)   Client shall ensure that Benchmark International and its role are referenced in any press release concerning the Transaction (i) issued jointly by Client and Counterparty and mentioning any buy-side or sell-side advisor or (ii) issued solely by a Client Party. In addition, Benchmark International shall be entitled to announce, from time to time, at a minimum, the name of the Business, the name of Counterparty, and the nature of the Transaction.

**6.   Payment Terms**

(a)   All fees paid to Benchmark International are non-refundable. In the event of termination, expiration, or cancellation of this Agreement, all fees previously paid to Benchmark International shall be retained by Benchmark International and all fees earned by Benchmark International but not yet paid to Benchmark International shall remain due and payable. Benchmark International represents and warrant that all its bank accounts are presently maintained in the State of Florida and all payments to Benchmark International are processed in the State of Florida.

(b)   Each Client Signatory is jointly and severally liable to Benchmark International for the payment of the fees and other sums set forth in this Agreement and, with regard to such fees and sums, Benchmark International shall be deemed an intended third-party beneficiary of each of the definitive agreements relating to any Transaction.

(c)   The Transaction Fee is due in addition to any other fees set forth in this Agreement and shall be paid in full directly to Benchmark International, in Florida, on Client's behalf by the Counterparty(ies) to the Transaction (or such Counterparty(ies) disbursing agent), in readily-available funds denominated in US dollars contemporaneously with the closing of the Transaction. **Counterparty** means, together with their affiliates and related parties, the person(s) and/or entitiy(ies) that enter(s) into a Transaction with any Client Signatory and shall include for all purposes at and after the closing of a Transaction those portions of the Business transferred pursuant to the Transaction.

(d)   Time is of the essence with regard to all payments due under this Agreement. Client shall make all payments to which Benchmark International becomes entitled under this Agreement on the date Benchmark International becomes so entitled. For example, the Transaction Fee is due in full on the Transaction closing date. In the event Client fails to make any required payment in full on the date such payment is due, Benchmark International may charge, and Client agrees to promptly pay to Benchmark International, an administrative fee equal to 5% of the overdue payment (the **Administration Fee**). Neither the payment of such Administration Fee nor the promise to pay such fee shall result in any late payment being excused as a breach of this Agreement. In any case where the payment of such Administration Fee is legally unenforceable, the Transaction Fee shall instead be increased by the amount that would have been chargeable as such Administrative Fee. In addition, Benchmark International may charge Client and Client agrees to promptly pay to Benchmark International, the lesser of (i) a monthly simple interest rate of 1.5% and (ii) the maximum amount permitted by applicable law, from the date any payment became due to the date such payment is made in full. Client shall additionally be liable for and agrees to promptly pay to Benchmark International, all fees, costs, and expenses incurred by Benchmark International or its affiliates for the recovery of past due payments under this Agreement, including but not limited to collection agent fees, court costs, and attorneys' fees. In the event Benchmark International has reason to believe that a Transaction Fee is due or that additional data is required to accurately calculate such fee, Benchmark International shall be entitled to a written accounting from each Client Signatory.

(e)   The Services will be deemed fully performed as of the closing of the Transaction. It is extremely rare that Benchmark International has been asked to perform any additional services for a client following the closing of that client's transaction. Following the closing of the Transaction, any additional services requested of Benchmark International by Client shall be provided at Benchmark International's sole discretion and Client will reimburse Benchmark International for all out of pocket expenses associated with the provision of such additional post-closing services together with the cost of the associated labor at a modest hourly rate not to exceed $200 per hour.

19.2(0) See Addendum A

(f)   Except to the extent reasonably necessary to consummate a Transaction or collect any fees due hereunder, the parties shall not disclose to any party any information concerning the timing or amount of fees and other sums payable or paid to, or claimed by, Benchmark International hereunder.

**7.   Transaction Value**

(a)   It is important that Client reserve as much flexibility as possible in structuring its Transaction as such flexibility will typically expand the range of potential suitors and maximize the Transaction's benefit to Client. Benchmark International believes it should not preclude its clients from any deal structure or bias them toward or away from any structure as a result of the definition of the Transaction Value. Accordingly, defining herein the precise components of Transaction consideration upon which the Transaction Value is determined would be counterproductive to the purposes of this Agreement. **The parties therefore agree that** Transaction Value **means the total benefit received or to be received by any Client and any of Client's affiliates or related parties (each Client, affiliate, and related party, a** Client Party**) pursuant to the Transaction regardless of the source, form, or timing of such consideration** and that such consideration may consist of one or more of the following illustrative examples if, in the sole discretion of Benchmark International, inclusion of such consideration would be warranted to calculate the total benefit received **or to be received** by any Client Party pursuant to the Transaction:

(i)   any cash or other asset paid to, issued to, or transferred to any Client Party at the time of, or as a result of, the Transaction;

(ii)   any liability of the Business which is assumed, paid, assigned, guaranteed or forgiven at the time of, or as a result of, the Transaction;

(iii)   the maximum consideration which may be provided to any Client Party by any Counterparty following the closing of the Transaction, regardless of whether any part of such consideration is deferred, contingent, or derived as a royalty, license, lease, franchise fee, salary, bonus, earn out, retention payment, incentive compensation, interest, sale of personal goodwill, issuance of securities pursuant to an option or warrant exercise, or the like;

(iv)   any asset of the Business which is not purchased by any Counterparty(ies) and which is issued to, retained by or transferred to any Client Party prior to, on, or subsequent to the date of the Transaction; and

(v)   the total consideration payable by the Counterparty(ies) to all Client Parties, including any consideration that is or would be payable under any option to acquire more of the Business than is acquired during the Transaction.

(b)   The closing of a Transaction occurring as a result of clause (iv) or (v) of the definition of "Transaction" in Section 5(d) above shall be deemed to have occurred on the date such filing is made and Benchmark International may, in its discretion and upon written notice to Client, waive the calculation of any Transaction Fee based on the Transaction Value and instead have the right to immediately and directly collect from the Client Signatories (other than those for whom a petition for bankruptcy has been filed) the fixed amount set forth in the Section 3(b) above.

(c)   The Transaction Value shall be computed before deducting interest, expenses, and taxes; without offsetting any liabilities of the Business not transferred to the Counterparty.   In the event any Client Party agrees to a holding period for any portion(s) of the consideration, or a holding period is imposed by law, such holding period shall have no bearing on the date payment of the Transaction Fee shall become due and payable and such holding period shall not result in any decrease in the Transaction Value.

**(d)   To assist Client and their advisors in evaluating offers, indications of interest and letters of intent; Benchmark International shall provide a pro forma invoice detailing the calculation of the Transaction Fee estimated to be payable in the event of a closing of the Transaction outlined in any offer, indication of interest or letter of intent upon Client's request. The final Transaction Fee may of course vary from such estimate as such initial indications of interest do not typically provide a full breakdown of the Transaction Value and the terms of the final Transaction may not match those of the initial indication. Owing to this fact, Benchmark International shall update its pro forma invoice at any time, and as many times, as requested by Client.**

**(e)   This Agreement does not obligate Client to enter into a Transaction with any person or entity. Client has the choice to reject any offer, indication of interest or letter of intent presented pursuant to this Agreement for any reason or no reason whatsoever.**

**8.   Early Termination; Effect of Termination**

(a)   In order for any Formal Termination Notice to result in the effective early termination this Agreement, such notice must be submitted in the form attached hereto as Exhibit A and during the period between its delivery and its stated termination date neither Client nor its agents may conduct any negotiations concerning a Transaction, Client must not be in breach of this Agreement, and no fees due to Benchmark International may remain outstanding.

(b)   All provisions of this Agreement that may reasonably be construed as surviving the expiration, termination, or cancellation of this Agreement, including without limitation any obligation to pay a Transaction Fee or other sum, limitation of liability, or indemnification provisions, shall survive such event and continue to bind the applicable party(ies) and its/their successors and assigns; provided that any Transaction occurring after the first anniversary of the expiration, termination, or cancellation of this Agreement shall result in the obligation to pay a Transaction Fee only in the event one or more of the Counterparties to such Transaction is either (i) an employee stock option, ownership, or similar plan or (ii) a person or entity (or an affiliate or related party of such person or entity) who during the Term was (A) identified in the Proprietary Prospect Portfolio or otherwise identified by Client or any other party as a potential Counterparty to a Transaction; (B) supplied or otherwise viewed Benchmark International-prepared information about the Business; (C) introduced to Client by Benchmark International; (D) in discussions or negotiations with Client or any agent of Client concerning a possible Transaction; (E) a Client Signatory; (F) employed by Client; (G) an individual, or hired an individual, employed by any entity described in clauses (A) thorough (E) of this sentence if such individual had personal knowledge during the Term that the Business was on the market.

9.   **Damages**

EXCEPT TO THE EXTENT ANY LOSSES OR DAMAGES ARE THE DIRECT RESULT OF ANY FRAUDULENT OR OTHERWISE INTENTIONALLY TORTIOUS ACT OF BENCHMARK INTERNATIONAL, ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES; EACH CLIENT SIGNATORY, ON BEHALF OF THEMSELVES AND THEIR AFFILIATES AND RELATED PARTIES, HEREBY RELEASES BENCHMARK INTERNATIONAL, ITS AFFILIATES, AND ITS AND THEIR EMPLOYEES FROM ANY LIABILITY WHATSOEVER WITH RESPECT TO ANY DAMAGES OR LOSSES OF ANY KIND, INCLUDING LEGAL FEES, ARISING AS A RESULT OF, OR RELATING TO OR ARISING OUT OF, THIS AGREEMENT OR THE PROVISION OF THE SERVICES TO THE EXTENT SUCH DAMAGES OR LOSSES EXCEED, IN THE AGGREGATE, THE TOTAL FEES THAT HAVE BEEN PAID TO BENCHMARK INTERNATIONAL BY CLIENT PURSUANT TO THIS AGREEMENT.

**10.   Miscellaneous**

(a) Each Client Signatory hereby represents and warrants that:

(i)   he, she, or it has all requisite power to enter into this Agreement and execute any other documents and instruments contemplated herein;

(ii)   he, she or it understands the meaning of a "sole and exclusive" brokerage relationship; and

(iii)   the Client Signatories constitute the direct owners of all of the outstanding equity interest in the entity(ies) performing the Business and, in the event any owner, affiliate, or related party who is not a Client Signatory receives any portion of the Transaction Value, each Client Signatory shall be responsible for paying to Benchmark International that portion of the Transaction Fee attributable to the portion of the Transaction Value received by such owner, affiliate, or related party as if that portion of the Transaction Value had been received by the Client Signatory himself, herself, or itself.

(b)   Notice provided to any one Client Signatory shall constitute notice to each Client Signatory and approval by any one Client Signatory shall constitute approval by all Client Signatories.

(c)   This Agreement shall not be assignable by any Client Signatory.

(d)   This Agreement may be signed in two or more counterparts each of which together shall be deemed to be an original and all of which together shall constitute one and the same instrument.

(e)   Any provision may be amended and the observance thereof may be amended or waived only by the written consent of Benchmark International and each Client Signatory. Failure by any party to enforce another party's strict performance of any provision of this Agreement shall not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Agreement.

(f)   If a court of competent jurisdiction determines that provisions of this Agreement are illegal or excessively broad then such provisions shall be construed so that the remaining provisions of this Agreement shall not be affected, but shall remain in full force and effect, and any such illegal or overly broad provisions shall be deemed, without further action on the part of any person or entity, to be modified, amended or limited, but only to the extent necessary to render the same valid and enforceable in the applicable jurisdiction.

(g)   This Agreement shall be governed by and all disputes arising out of or relating to this Agreement or the transactions contemplated herein shall be governed by and construed in accordance with the laws of Florida applicable to contracts to be fully performed therein, without giving effect to any choice of law rule therein that would require the application of the law of any other jurisdiction.

(h)  Any action or proceeding relating in any way to this Agreement shall be brought and enforced in the United States District Court for the Middle District of Florida or the courts of the State of Florida located in Hillsborough County, Florida, and every party hereto irrevocably consents to the jurisdiction of each such court in respect of any such action or proceeding.

(i)  In the event that any party to this Agreement brings suit against another party to this Agreement or any of such other party's affiliates or employees to enforce or challenge this Agreement, or in response to any alleged breach of this Agreement or the alleged commission of any tort arising from or related to the subject matter of this Agreement,  the non-prevailing party shall pay to each prevailing party all of that prevailing party's costs associated with such suit and related collection efforts, including without limitation reasonable attorney's fees both at trial and at the appellate level, subject in all cases to any limitation of liability provision contained herein.

(j)  Except as required by law, Benchmark International shall not disparage or threaten to disparage Client or Client's performance, take any action which could reasonably be expected to adversely affect Client's personal or professional reputation, or otherwise take any action which would reasonably be expected to lead to unwanted or unfavorable publicity to Client.  Similarly, except as required by law, Client will not disparage or threaten to disparage Benchmark International or Benchmark International's performance, take any action which could reasonably be expected to adversely affect the personal or professional reputation of Benchmark International or its employees, or otherwise take any action which would reasonably be expected to lead to unwanted or unfavorable publicity about Benchmark International. Client acknowledges that Benchmark International's disclosure to prospects of unfavorable facts concerning the Business shall not constitute disparagement or otherwise represent a breach of this covenant in the event such facts are revealed during the Term and in the course of providing the Services.

(k)  CLIENT UNDERSTANDS AND ACKNOWLEDGES THAT:

(i)  THE PERSONNEL REPRESENTING BENCHMARK INTERNATIONAL IN NEGOTIATING THIS AGREEMENT DO NOT HAVE AUTHORITY TO MAKE ANY STATEMENTS, PROMISES OR REPRESENTATIONS IN CONFLICT WITH OR IN ADDITION TO THE INFORMATION IN THIS AGREEMENT AND BENCHMARK INTERNATIONAL SPECIFICALLY DISCLAIMS ANY RESPONSIBILITY FOR ANY SUCH STATEMENTS, PROMISES, OR REPRESENTATIONS;

(ii)  CLIENT HAS NOT RELIED UPON SUCH STATEMENTS, PROMISES, OR REPRESENTATIONS AND WAIVES ANY RIGHTS OR CLAIMS ARISING FROM ANY SUCH STATEMENTS, PROMISES, OR REPRESENTATIONS;

(iii)  WHILE CLIENT AND THE PERSONNEL REPRESENTING BENCHMARK INTERNATIONAL IN NEGOTIATING THIS AGREEMENT MAY HAVE DISCUSSED POTENTIAL VALUE RANGES FOR THE BUSINESS AND/OR TARGET SALE PRICES AND TRANSACTION STRUCTURES, THE EXACT VALUE OF THE BUSINESS COULD NOT POSSIBLY BE ASCERTAINED BY BENCHMARK INTERNATIONAL OR ANY OTHER PARTY WITHOUT GOING TO MARKET  AND, FURTHER, THAT THE EXACT VALUE OF THE BUSINESS AND THE PRECISE STRUCTURE OF AN EVENTUAL TRANSACTION CAN ONLY BE DETERMINED BY WHAT A WILLING AND ABLE COUNTERPARTY AGREES TO PAY AND CLIENT AGREES TO ACCEPT IN AN ARMS-LENGTH TRANSACTION IN THE ABSENCE OF DURESS;

(iv)  BENCHMARK INTERNATIONAL'S ENGAGEMENT IS NOT A GUARANTEE THAT A VALUE OR STRUCTURE ACCEPTABLE TO CLIENT WILL OR CAN BE ACHIEVED VIA THE PROVISION OF THE SERVICES;

(v)  THE PROPRIETARY PROSPECT PORTFOLIO BENCHMARK INTERNATIONAL WILL PREPARE FOR THIS ENGAGEMENT CONTAINS THE LEGALLY-PROTECTIBLE INTELLECTUAL PROPERTY OF BENCHMARK INTERNATIONAL AND AS SUCH BENCHMARK INTERNATIONAL HAS THE RIGHT TO RETAIN AS CONFIDENTIAL THE METHODS USED TO CREATE SUCH PORTFOLIO AND THE RESULTS OF THOSE METHODS.

(vi)  ANY CURRENT OR PRIOR UNDERSTANDINGS, STATEMENTS, REPRESENTATIONS, AND AGREEMENTS, ORAL OR WRITTEN, INCLUDING, BUT NOT LIMITED TO, RENDERINGS OR REPRESENTATIONS CONTAINED IN BROCHURES, ADVERTISING OR SALES MATERIALS AND ORAL STATEMENTS OF PERSONNEL REPRESENTING BENCHMARK INTERNATIONAL, IF NOT SPECIFICALLY EXPRESSED IN THIS AGREEMENT, ARE VOID AND HAVE NO EFFECT; AND

(vii)  CLIENT HAS NOT RELIED ON ANY SUCH UNDERSTANDINGS, STATEMENTS, REPRESENTATIONS, AND AGREEMENTS AND THAT THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT AND SUPERSEDES ANY PRIOR DISCUSSIONS, CORRESPONDENCE, UNDERSTANDINGS, STATEMENTS, REPRESENTATIONS, AGREEMENTS, OR COMMUNICATION OF ANY NATURE RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY NON-DISCLOSURE OR CONFIDENTIALITY AGREEMENTS OR UNDERTAKINGS.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the Commencement Date.

| NAME | SIGNATURE | TITLE/CAPACITY |
|---|---|---|
| Lucas Durr | *Lucas Durr* | Authorized Signature for Benchmark International |
| Gerard Burdi | *Gerard Burdi* | As President, on behalf of, Union Paving & Construction Co., Inc. |
| Gerard Burdi | *Gerard Burdi* | As Managing Member, on behalf of, Tracks Unlimited, LLC |
| Gerard Burdi | *Gerard Burdi* | Individually |
| Nicholas Burdi | *Nicholas Burdi* | Individually |

19.2(0) See Addendum A

1/11/2024 7:21 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 5

**EXHIBIT A**
**Formal Termination Notice**

1. This notice is sent in reference to Section 4(b) of the Terms of Engagement (the **Agreement**) made as of_____ (the **Commencement Date**) by and among _____, (each a **Client Signatory** and, the____, collectively, the **Client**) and Benchmark International _____, LLC (**Benchmark International**).

2. This notice is delivered by and on behalf of each of the Client Signatories.

3. Section 4(b) states that (a) such notice may be given at any time "unless (i) negotiations concerning a Transaction are occurring, (ii) Client is in breach of this Agreement, or (iii) any fees due to Benchmark International remain outstanding" and (b) termination of the Agreement will be effective only after the prescribed time period has elapsed.

4. The Client Signatories hereby certify that (a) no negotiations concerning a Transaction are occurring, (b) Client is not in breach of this Agreement, (c) no fees due to Benchmark International remain outstanding, and (d) no Transaction has occurred since the Commencement Date.

5. The Client Signatories acknowledge that should any of the statements in paragraph 4 above become inaccurate prior to the elapsing of the time period set forth in Section 4(b), this notice shall be of no further force or effect and no subsequent notice may be provided until the restoration of the required condition(s). The Client Signatories agree to notify Benchmark International of any change of circumstance that would so render this notice ineffective.

6. The Client Signatories hereby acknowledge their surviving obligations under the Agreement, including without limitation, Sections 5(e) and 8.

7. Given the foregoing, the effective date of the termination of the Agreement shall be _____.


On behalf of the Client Signatories


Name: _____

Title: _____

Organization: _____


Acknowledgement of Receipt on behalf of Benchmark International


Name: _____

Title: _____

Date of Receipt: _____

## ADDENDUM A

to the Terms of Engagement made as of December 22, 2021 between Benchmark International and Client

1. Section 7(a)(iii) of this Agreement is hereby amended by inserting to the end of such section "provided that if consideration is paid in the form of a salary to Gerard Burdi or Nicholas Burdi, only the amount above $500,000 each per year will be included in the calculation of the Transaction Value.".
2. Section 10(a) of this Agreement is hereby amended by inserting ", and with respect to subsection (i) below, Benchmark International hereby represents and warrants," immediately following "represents and warrants".
3. Section 10(g) of this Agreement is hereby amended by deleting "Florida" and inserting in its place "New York".
4. Section 10(h) of this Agreement is hereby deleted in its entirety and replaced with "Reserved".
5. This Addendum A applies to the Terms of Engagement and is incorporated by reference into such agreement. Any reference to such Terms of Engagement or "this Agreement" shall be a reference to such agreement as augmented by this Addendum A. In the event of a conflict between any provisions of this Addendum A and any provision contained elsewhere in the Terms of Engagement, the provision of this Addendum A shall supersede the conflicting provision contained elsewhere.

∞-∞-∞-∞-∞



**AMENDMENT AND JOINDER TO TERMS OF ENGAGEMENT**

This Amendment No. 1 and Joinder is made this 23 day of February 2022

**Between**    Union Paving & Construction Co., Inc., Tracks Unlimited, LLC, Gerard Burdi, Nicholas Burdi, Gerard L Burdi Living Trust, Gerard L Burdi Small Business Trust 2018, Nicholas M Burdi Living Trust, and Nicholas M Burdi Small Business Trust 2018;

**And**    Benchmark International CSSA, LLC ("Benchmark International")

A.  Union Paving & Construction Co., Inc., Tracks Unlimited, LLC, Gerard Burdi, Nicholas Burdi, and Benchmark International (collectively, the "Original Parties") entered into a Terms of Engagement (as amended, the "Agreement") made as of December 22, 2021 (the "Commencement Date") and now desire to amend the Agreement as set forth herein;

B.  Gerard L Burdi Living Trust, Gerard L Burdi Small Business Trust 2018, Nicholas M Burdi Living Trust, and Nicholas M Burdi Small Business Trust 2018 (the "Additional Parties"), together with Gerard Burdi and Nicholas Burdi, are shareholders of Union Paving & Construction Co., Inc. and Tracks Unlimited, LLC but the Additional Parties were inadvertently left off the Agreement as parties and as a component of the definitions of "Client" and "Client Signatories".

The parties hereby agree, for mutual consideration, the receipt and sufficiency of which is hereby acknowledged, as follows.

1.  By execution of this Amendment and Joinder, the Additional Parties agree to be joined to and bound by the terms of the Agreement and the Original Parties to the Agreement consent to such joinder as if the Additional Parties had been incorporated in such definitions since the Commencement Date.

2.  The definitions of "Client" and "Client Signatory" shall be expanded to include the Additional Parties and for all purposes the Agreement shall be interpreted as if the Additional Parties had been incorporated in such definitions since the Commencement Date.

3.  Unless defined in this Amendment and Joinder, capitalized terms used herein are used as defined in the Agreement. Except as expressly amended by this Amendment and Joinder, the Agreement remains in full force and effect. In the event of any conflict between the terms of this Amendment and Joinder and those of the Agreement, the terms of this Amendment and Joinder shall be controlling.

The undersigned has caused this Amendment and Joinder to be executed by its duly authorized representatives.

| Gerard Burdi | *Gerard Burdi* | As President, on behalf of, Union Paving & Construction Co., Inc. |
| --- | --- | --- |
| Gerard Burdi | *Gerard Burdi* | As Managing Member, on behalf of, Tracks Unlimited, LLC |
| Gerard Burdi | *Gerard Burdi* | As Trustee, on behalf of, Gerard L Burdi Living Trust and Gerard L Burdi Small Business Trust 2018 |

V21.1o

| Nicholas Burdi | | As Trustee, on behalf of, Nicholas M Burdi Living Trust and Nicholas M Burdi Small Business Trust 2018 |
|---|---|---|
| Gerard Burdi | *Gerard Burdi* | Individually |
| Nicholas Burdi | | Individually |
| Dara Shareef | | Authorized Signature for Benchmark International |

V21.1o                                 Page 1 of 1

| Nicholas Burdi | *Nicholas Burdi* | As Trustee, on behalf of, Nicholas M Burdi Living Trust and Nicholas M Burdi Small Business Trust 2018 |
|---|---|---|
| Gerard Burdi | | Individually |
| Nicholas Burdi | *Nicholas Burdi* | Individually |
| Dara Shareef | | Authorized Signature for Benchmark International |

V21.1o

Page 1 of 1

**IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA
CIVIL DIVISION**

BENCHMARK INTERNATIONAL
CSSA, LLC,

      Plaintiff,

v.                                  Case No.

                                        Division:

GERARD BURDI,
NICHOLAS BURDI,
GERARD BURDI AS TRUSTEE
OF THE GERARD L. BURDI LIVING TRUST,
GERARD BURDI AS TRUSTEE OF THE
GERARD L. BURDI SMALL BUSINESS TRUST 2018,
NICHOLAS BURDI AS TRUSTEE OF THE
NICHOLAS M. BURDI LIVING TRUST,
NICHOLAS BURDI AS TRUSTEE OF THE
NICHOLAS M. BURDI SMALL BUSINESS TRUST 2018,
UNION PAVING & CONSTRUCTION CO., INC, and
TRACKS UNLIMITED, LLC

      Defendants.
_____/

**EXHIBIT B TO**

**<u>COMPLAINT</u>**

| From: | Gerard Burdi |
|---|---|
| To: | Kayla Sullivan |
| Subject: | RE: Union Ownership Update |
| Date: | Thursday, September 7, 2023 8:29:26 AM |
| Attachments: | image001.png |

Kayla,

I am available to discuss this afternoon. In conjunction with the buyout of my brother, we did some estate planning and the current ownership structure of both companies is as follows;

  1.) Gerard L. Burdi Small Business Trust 25%
  2.) Gerard L. Burdi Sweat Equity Trust 5%
  3.) Gerard L. Burdi 20%
  4.) Kyle G. Burdi 25%
  5.) Kyle G. Burdi Dynasty Trust 25%

If further discussion is needed, please call my cell after 1:00 today 201-965-8705.

Gerard L. Burdi
President
Union Paving & Construction Co.,Inc.
908 232 4100, x-213
Fax 908 232 0738

**From:** Kayla Sullivan <Sullivan@benchmarkintl.com>
**Sent:** Wednesday, September 6, 2023 2:05 PM
**To:** Gerard Burdi <gerardb@unionpaving.com>
**Subject:** Union Ownership Update

***CAUTION***

This message came from an **EXTERNAL** address (Example: billgates135246@gmail.com). **DO NOT** click on links or attachments unless you know the sender and the content is safe. **Employees Should Forward Messages That May Be Cyber Security Risks To** ReportSpam@unionpaving.com.

Hi Gerard,

I hope you are well. I just called and left a voicemail, but I was calling to discuss the recent change in ownership to update the marketing materials. Please let me know when it is a good time to discuss the details over a call.

Thanks!

**Kayla Sullivan**
Associate Transaction Support Director

**Benchmark International**

---

T: <u>+1 813 898 2350</u> | DD: <u>+1 813 898 2380</u>

**<u>www.BenchmarkIntl.com</u>**

4030 W Boy Scout Blvd Ste 500, Tampa, FL 33607

---

**Quick Links:** <u>Buyers</u> | <u>Buyer Profile</u> | <u>Our Success</u> | <u>Blog</u> | <u>Opportunity Portal</u> | <u>LinkedIn</u>



**CAUTION:** This email originated from outside of Benchmark International. Do not click links or open attachments unless you recognize the sender and know the content is safe.